CLARA B. MILLER et al., Respondents, v. MISSOURI GUARANTEE SAVINGS AND BUILDING ASSO- CIATION OF HANNIBAL, MISSOURI, Appellant.

| 83 | 669 |
| 85 | 396 |
| 85 | 482 |
| 158s | 621 |
| 83 | 669 |
| 92 | 489 |

St. Louis Court of Appeals, March 27, 1900.

1. **Building and Loan Associations: METHOD OF MAKING LOANS: STATUTORY CONSTRUCTIONS: CORPORATION: DIRECTORS.** Section 2812, Revised Statutes 1889, governing building and loan associations, provides that in making loans "the directors of the corporation shall hold stated meetings, at which such sums of money as they may determine shall be offered for loan to all the members in open meeting, the shareholder who shall bid the highest for the preference, or priority of loan, shall be entitled to receive a loan whose amount shall not exceed the number of shares of stock held by such shareholders."

2. ———: ———: ———: **INTEREST LAWS.** The effect of this provision is to modify the general interest law of the state and to legalize the taking of premiums, provided such premium or bonus is the result of a public offer of the money for loan in the mode presented by the statute.

3. ———: ———: ———. In the case at bar the money loaned was not awarded to the highest bidder, but to the competitor for the money, who offered the most satisfactory security.

4. ———: ———: ———: **USURY.** And that the premiums collected on the loan were illegal exactions and rendered the transaction usurious.

Appeal from the Lawrence Circuit Court.—*Hon. Henry Clay Pepper,* Judge.

AFFIRMED.

*E. O. Brown* for appellant.

(1) Under the Revised Statutes of Missouri of 1889, governing building and loan associations, which permits associations formed thereunder to sell their loans in open meetings to the stockholder biding the highest premium, which premium is not to be considered as fixed, within the general usury law, the written bid for preference contained in the borrower's application for a loan when submitted, as in this case, to the board of directors in open meeting meets the requirements of the statute. Hughes v. Farmers Savings, Bldg. & Loan Ass'n (Tenn.), 46 S. W. Rep. 362; Bertche v. Equitable Loan & Investment Ass'n of Sedalia (Mo.), 48 S. W. Rep. 954; Springfield Engine & Thresher Co. v. Donovan et al. (Mo.), 49 S. W. Rep. 500. (2) While a by-law of a building and loan association which fixes a minimum premium below which bids will not be considered may render a transaction usurious as to one who was forced to bid a larger premium than he otherwise would have been required to pay, yet, when one voluntarily bids a premium for preference or priority of a loan in excess of that required by the by-law he can not be heard to complain. U. S. Savings & Loan Co. v. Shain, 77 N. W. Rep. 1006; Thornton & Blackledge on Law of Bldg. & Loan Ass'n, sec. 229; Albright v. LaFayette B. & L. Ass'n, 102 Pa. St. 411.

*Edw. J. White* for respondents.

(1) The record does not disclose any legal evidence of any competitive bidding for the loan to Bonnefon. The

testimony of Hayward was based solely on book entries not made by him and he had no personal knowledge of the matters narrated, having been in the state of Tennessee at the date of the occurrences in question. Traber v. Hicks, 131 Mo. 180. (2) Such evidence is but hearsay and when incorporated in a deposition is not within the rule that the relevancy of the evidence should be settled before the trial. (3) The loan to Bonnefon was made under an agreement between the borrower and the appellant's agent, at a fixed premium, determined upon before any application by the borrower and was not made under free and competitive bidding, as required by the statute. Post v. Mechanics B. & L. Ass'n (Tenn.), 37 S. W. Rep. 216; Price v. Empire Ass'n, 75 Mo. App. 551; Moore v. B. & L. Ass'n, 74 Mo. App. 468; Brown v. Archer, 62 Mo. App. 277.

BIGGS, J.—The defendant is organized under the laws of Missouri as a building and loan association with its chief office at the city of Hannibal, Missouri. In 1892 one C. F. Bonnefon was the owner of eight shares of the stock of defendant of the par value of one hundred dollars each. In that year Bonnefon borrrowed of the association $700 and pledged his stock as collateral security for the loan. As further security he executed a deed of trust on certain lots owned by him and situated in the city of Aurora, in Lawrence county, Missouri. One Thompson was the local agent of defendant at Aurora, who solicited loans and reported upon the value of real estate offered as security. On the eighth day of July, 1892, Bonnefon applied to Thompson for the loan. His application for the loan was written and signed in Aurora and sent from there to the company at Hannibal. In the application Bonnefon agreed to pay six per cent interest on the loan and he bid as a monthly premium forty cents on the hundred dollars, which he agreed to pay each

month. According to the records of the association the application was favorably considered by the board of directors of defendant at a meeting held in Hannibal on July 14, 1892. The minutes of the meeting contain this, to wit: "The association having funds on hand to loan and the following named persons having offered sufficient security and being the highest and best bidders, were awarded the amounts set opposite their names subject to the approval of their abstracts by the general attorney." Then follow the names of about thirty applicants; among them is that of Bonnefon. In the obligation signed by Bonnefon for the loan he agreed to pay the following sums: On the twentieth day of each month for one hundred months, to wit, monthly dues $3.50; interest on loan $4.20, and $2.80 premium for priority of loan, making a total of $10.50. This obligation was set forth in the deed of trust which was conditioned upon the prompt payment of the aforesaid sums. Bonnefon continued to make the monthly payments until December, 1892, when he conveyed the lots and shares of stock to Thompson in trust to be sold for his (Bonnefon's) benefit. On the third day of December, 1892, Thompson for a consideration sold the lots and stock to plaintiff, Clara B. Miller, the wife of T. A. Miller, her co-plaintiff. This conveyance contained this recital, to wit: "This deed is given subject to deed of trust to secure the payment of a promissory note for seven hundred dollars, which party of the second part assumes and agrees to pay as it may become due; the above mentioned note being held by the Missouri Guarantee Savings and Building Association of Hannibal, Missouri." It is conceded that after the purchase the plaintiff Clara B. Miller continued to pay the monthly assessments up to and including August, 1898; that during the time there was paid to the defendant $296 in monthly dues; $307.44 interest, and $204.96 in premiums. At that time the plaintiffs refused to

make further payments, claiming that the stipulated interest
and the further sums exacted as premiums exceeded the law-
ful rate of interest, thus making the transaction usurious;
that they were entitled to have the so-called premiums,
which were not the result of competitive bidding, entered as
credits, and if so applied the plaintiffs would owe the de-
fendant $22.97. They demanded of defendant an adjust-
ment of the matter on this basis, which was refused. The
defendant claimed that the transaction was not tainted with
usury, and that under the terms of the contract the plaintiff
then owed defendant $445.16. The present action was there-
upon instituted for an accounting and for a cancellation of
the deed of trust upon the payment by the plaintiffs of the
amount so found to be due. The cause was submitted to the
court and the issues were found for the plaintiffs. In stating
the account the court allowed credit for the usurious payments
and found that plaintiffs owed the defendant a balance of
$191.96 and it decreed a cancellation of the deed of trust
upon the payment of that sum. From that judgment the
defendant has appealed, and it attacks the decree upon the
grounds (1) that the evidence conclusively shows that the
loan was made to Bonnefon in the manner required by the
statute, and therefore the monthly premium bid by him was
lawfully exacted; and (2) even though the transaction was
tainted with usury the plaintiffs are estopped to plead or
prove it.

Section 2812, Revised Statutes 1889, governing build-
ing and loan associations provides that in making loans "the
directors of the corporation shall hold stated meetings, at
which such sums of money as they may determine shall be
offered for loan to all the members in open meeting. The
shareholder who shall bid the highest for the preference, or
priority of loan, shall be entitled to receive a loan whose
amount shall not exceed the number of shares of stock held by

such shareholders," etc. The effect. of this provision is to modify the general interest law of the state and to legalize the taking of premiums, provided such premium or bonus is the result of a public offer of the money for loan in the mode prescribed by the statute. The questions are: First, was there a lawful bid made by Bonnefon, and second was the bonus the result of competitive bidding in an open meeting held by the board of directors of the company?

It was not necessary, as counsel for respondents claim, that Bonnefon should have made his bid in person. The written bid forwarded to the general office by Thompson was sufficient. This was the decision of the chancery court of appeals of Tennessee in Hughes v. Bldg. and Loan Association, reported in 46 S. W. Rep. 362. The same ruling was made by our supreme court in Springfield Engine and Thresher Company v. Donovan, 49 S. W. Rep. 500.

If the minutes of the meeting of the board of directors of July 14 are accepted as true, the loan was made to Bonnefon in full compliance with the statute, for the record shows a loan made in open meeting and that the premium bid was the result of competitive bidding. But the truth of the minutes are contradicted by the testimony of Thompson, the local agent, as appears by the following excerpts from his testimony:

"Q. Now, I will get you to state what condition this loan was made under to Mr. Bonnefon by the association through you as its agent. In that connection state the facts; what was done by you and what Bonnefon did? A. (Taking application above referred to.) This handwriting looks like mine; there are some things in here I don't think I ever put in there.

"Q. I will get you to state if that was the application furnished you by the defendant association and if that was in accordance with all the blank applications furnished you

while you were acting as their local agent there? A. It is the same kind of a blank they use, it is not exactly the same kind of a blank they furnished at all times. My recollection was it wasn't the kind of a blank that was used at that time.

"Q. I will get you to state under what condition now, this loan was made. Tell the court the conditions under which the company made the loan through you as local agent there. What did you and what did Bonnefon do? A. Well, about the only thing Bonnefon had to do—he, of course come first about the stock; I think he had eight hundred dollars of stock there and he applied for eight hundred dollars of loan and agreed to pay on that loan fifteen dollars a month for one hundred months; that was the agreement or understanding.

"Q. That would be one dollar and fifty cents on the hundred? A. That was the proposition they made to loan their money for one dollar and fifty cents on each one hundred dollars loan.

"Q. I will ask you to state what your instructions were with regard to making those other loans at the time? A. My instructions were to have application filled out and set forth the value of the property and then have the value of the property appraised by the board of directors and the appraisement would be put on that application there and it would be understood that he was to pay so much a hundred interest and premium and so much dues each month on each hundred dollars and the application was sent to the board of directors at Hannibal and if the security was found satisfactory the money was furnished.

"Q. Who fixed the amount of interest, premium and dues that was to be paid for the loan in question? A. The association, as I understood it; all their literature set forth the amount of the premium and the amount of charges that

would be made to those they loaned to; everybody the same."

In opposition to this testimony and as tending to show that there was no fixed premium and that the bonus stated in the loan to Bonnefon resulted from competition in bidding, the defendant read the deposition of James Hayward, who previously and subsequently to making the loan to Bonnefon, was the actuary of the defendant company. The force of the testimony of this witness is very much weakened by the fact of his admission on cross-examination that he was not connected with the defendant company at the time Bonnefon borrowed the money, that he was not present at the meeting of the board of directors of July 14, and that his statements were based entirely on the minutes of that meeting and the usual methods adopted and followed by the company. The trial judge evidently credited the statements of Thompson. Accepting his testimony as true, the money was not awarded to the highest bidder, but to the competitor for the money who offered the most satisfactory security. In construing a like statute of the state of Tennessee the United States Circuit Court of Appeals in Douglass v. Kavanaugh, 90 Fed. Rep. 373, so decided in a case presenting a somewhat similar state of facts. It was there said: "This method was not in accordance with the charter power. There was no sale, no competitive bidding. The premium was not paid for precedence in obtaining a loan, but as a part of the price demanded by the lender from the borrower. The practice was in open and flagrant violation of the organic law of the corporation and premiums thus obtained were an unlawful exaction." On this question of fact we are inclined to coincide with the circuit court, and so finding we must hold with him that the premiums collected on the Bonnefon loan were illegal exactions and rendered the transaction usurious.

It is stated generally in the books that the defense of usury is personal to the debtor, but this statement of the

law can not be received without some qualifications, for the authorities recognize exceptions in favor of those who are privy to him in representation or blood.   Another exception is made in favor of the vendee of a mortgagor (American Rubber Company v. Wilson, 55 Mo. App. 656) unless he has precluded himself from making the defense by stipulations in his contract of purchase.   It has been held that he does not do this by a stipulation in his conveyance that he pur-· chased the land subject to the mortgage, for the reason as stated by Thornton and Blackledge in their work on Building and Loan Associations (sec. 258) that "the amount actually due on the debt enters into and forms a part of the considera-tion for the sale, and the purchaser is just as much inter-ested in securing its reduction to the amount lawfully due as was the vendor before the sale," citing Link v. Germantown Bldg. Ass'n, 89 Pa. St. 15.   There are authorities which decide to the contrary, but we are not disposed to follow them.   We think that the rule as above stated is the better one and we adopt it.   In this case Mrs. Miller  bought the land subject to the mortgage, and under the foregoing rule she was not estopped to insist on the usurious nature of the mortgage debt.

With the concurrence of the other judges, the judgment of the circuit court will be affirmed.   It is so ordered.